WASHINGTON REFRIGERATION CORPORATION, Respondent, *v.*
BENHERMAX CORP., Appellant.

First Department, May 10, 1955.

*Benjamin Heller* of counsel (*S. Stanley Kreutzer* with him on the brief; *Kreutzer Heller & Selman,* attorneys), for appellant.

*George Trosk* of counsel (*Jesse Climenko* and *Martin I. Shelton* with him on the brief; *Edward Raff,* attorney), for respondent.

CALLAHAN, J. P.  This appeal presents certain questions with respect to the construction and application of subdivision (k) of section 8 of the Business Rent Law (L. 1945, ch. 314, § 8, subd. [k], added by L. 1949, ch. 535 and last amd. by L. 1953, ch. 452). The principal point is whether a proposed lease, which the tenant is asked to match, may be one for only part of a single integrated store occupied by the tenant under a single lease.

The statute (Business Rent Law, § 8) reads, in pertinent part, as follows:

" § 8. So long as the tenant continues to pay the rent to which the landlord is entitled, under the provisions of this act, no tenant shall be removed from any business space, by action or proceeding to evict or to recover possession,  *  *  *  notwithstanding that such tenant has no lease or that his lease or other rental agreement has expired or otherwise terminated,  *  *  * unless:  *  *  *

'' (k) the landlord, subject to the following conditions, receives and accepts a bona fide offer to enter into a lease with a prospective tenant for any store having an emergency rent of at least three thousand dollars per annum, occupied by one tenant, which lease provides for a rental of three thousand six hundred dollars per annum or more, for a term of not less than ten years, non-cancellable except for the violation of any term or obligation of such lease, and the landlord offers to execute a lease containing the same terms and conditions with the tenant in possession and delivers to the tenant in possession a copy of such lease with the prospective tenant, and such tenant fails, neglects or refuses to execute such a lease within thirty days after tender thereof to such tenant ''.

Prior to March, 1941, the tenant leased, under separate instruments, several portions of a building from the owner, New York State Realty and Terminal Company. Under date of March 1, 1941, it executed a lease to said owner for five years at a single rental of $6,900 per annum for premises described in the lease as follows:

'' The store and sales office on the ground floor of said building, designated as Cooler #3 and shown outlined in green on the attached plan entitled ' Ground Floor 437–51 West 13th Street, New York City,' dated March 26, 1941.

'' The spaces on the second floor of said building shown outlined in green and designated as Cooler #4 and Storage and office space designated as #8 on the attached plan entitled ' Second Floor 437–51 West 13th Street, New York City,' dated March 26, 1941.

'' Together with the use of an electrically operated escalator or conveyor between the ground floor and the track platform of the Lessor.

'' Together with the use, in common with the Lessor and the other tenants of said premises 437–51 West 13th Street, of the stairs, hallway and toilets shown outlined in yellow on said second floor plan.''

It is apparent from the record that the area described as '' cooler '' space is refrigerated area, and that portions of both floors, including the front of the store on the ground floor, hallways and the office space on the second floor, were not refrigerated.

In 1942, the tenant also leased additional space on the second floor of the building known as Cooler No. 3. It used this additional area in connection with the premises demised under the 1941 lease, but because it was leased under a separate instrument,

we will treat the case for the purposes of this appeal as if the tenant's store premises were those leased under the instrument of March 1, 1941. That lease ran for five years with a privilege of renewal for another five years, which privilege was duly exercised. After April 30, 1951, the tenant became a statutory tenant, subject to a single rent of $6,900 per annum, plus 15%, which it continued to pay in one lump sum to the lessor. Later in 1951, the owner leased to the present landlord, Washington Refrigeration Corporation (hereinafter called Washington), the store and Cooler No. 3 on the first floor and office space No. 8 on the second floor, in addition to several other portions of the building not occupied by the present tenant.

This new major lease, insofar as it related to the ground floor space occupied by the tenant and office No. 8 on the second floor, was subject to the tenant's rights as a statutory tenant in possession. The tenant was notified by its lessor and owner of the fee to pay the rent for the last-mentioned space to the so-called new lessee (Washington), the landlord in these proceedings. The tenant, with the consent of the new landlord (Washington), apportioned the rent so as to pay to the fee owner a sum agreed to be a proper proportion of the charge for the space on the second floor known as Coolers No. 3 and No. 4, and paid the balance of the rent to the new landlord aforesaid.

The tenant was a wholesale handler and dealer in poultry and used the premises as an integrated store and salesroom, with office space on the second floor, and with its stock of packaged dressed poultry stored in the balance of the leased area. The "conveyor" mentioned in the lease operated as an escalator for freight within the demised premises to connect the ground floor and the second-floor space. The tenant handled approximately 5,000 to 6,000 packages of poultry per week. There was a railway siding on another level of the building. Some of the poultry was received by railway and some by truck, but it was all reshipped by truck when it left the premises. Trucks discharged and received goods at the curb in front of the store on the 13th Street side of the building, which was on the street level. The packages were stored either on that floor or on the second floor, to and from which they were conveyed by the conveyor. About fifty trucks a day were used to service the business.

There was direct access from the second floor of the building to the street by way of a hallway and stairs, and elevator service was available in common, however, with other tenants. But it is quite evident from the evidence and from examination of the plans that the cutting off of the first floor not only deprived the

tenant of the use of a sales office and the conveyor, but required an entirely different procedure for handling the packages of poultry that gave rise to different economic problems for the tenant.

In August, 1953, the landlord herein gave notice to the tenant that it had received from a corporation known as Morbelle Inc. an offer to lease the premises (first floor Room 3 and office 8 on second floor) in dispute for a term of ten years. The tenant was asked to match that lease. On its refusal, the landlord brought proceedings in the Municipal Court to oust the tenant, which, however, resulted in a final order in favor of the tenant on the ground that the proposed lease was not offered in good faith. Shortly thereafter, another proposed lease was tendered for matching purposes, in which Monarch Beef Corp., a second corporation, offered to lease the same premises previously proposed to be rented to Morbelle.

It is in connection with this second offer and the refusal of the tenant to match the same that the present proceedings have been brought. Several questions have been raised concerning defenses of *res judicata* and other matters resting on the institution of the prior proceedings. For reasons which will appear later, we find it unnecessary to discuss these questions.

The lease to Monarch Beef Co., which the tenant is now asked to match, relates only to the ground floor space and the small office on the second floor known as room No. 8. If the present tenant surrenders such space rather than match the new lease, it will be left in possession of two areas on the second floor, largely refrigerated, one of which it rented in 1941, and the other in 1942, but will be deprived of its store and salesroom on the ground floor and its office space on the second floor and will lose the use of the conveyor belt between the floors. Indeed, it is intended, as provided in the new lease, to eliminate the conveyor and close up the opening in the floor through which it passed. As noted, other, but less direct, access to the street would be available. However, this will require more hand-carriage of packages than under the present setup, and the tenant will have to share elevator service with other occupants of the building.

If it had not been for the fact that the tenant had acquiesced in the fee owner's request to apportion the $6,900 annual rent and pay a proportion thereof to the new landlord, the rent that it is paying for the ground floor space and for office No. 8 on the second floor would not even be capable of separate computation on the present record. A single rent was provided for all

of the space in the March, 1941, lease. We do not determine whether the apportionment of rent in 1951, by consent, in fact altered the obligation of the tenant, insofar as concerns liability for the rent of $6,900 (now increased by 15%) for the whole space, or affords it different rights as a statutory tenant. Even if we assume that the rent was capable of separate computation, the more difficult problem still remains as to whether a tenant may be required under subdivision (k) of section 8 (*supra*) to match a lease for less than the whole of his store premises, in which he is carrying on a single integrated business.

The legal result of a compulsory splitting of the space rented under a single lease would under ordinary circumstances, at least in the absence of the emergency rent law, constitute a partial eviction. Recourse to the statute shows no indication of legislative intent that a portion of a store could be recovered on a matched lease basis. A store is defined under the statute (Business Rent Law, § 8, subd. [k]), as follows: " As used in this subdivision the word ' store ' shall mean business space at street level and two floors above and below street level or any part thereof, provided it includes space at street level, used or to be used and/or occupied or to be occupied by a tenant for the sale of personal property and/or the rendition of services in the ordinary course of business."

Quite obviously, the words " any part thereof " in the foregoing definition refer to any part of the ground floor or lower floors used to make up a store, and not to any part of a store as such.

The effect of the division proposed in this case would be to eliminate from the premises occupied by the tenant the whole of the demised area on the street level so that what was left of the demised space on the second floor would not be a store within the definition of the statute. All of the space involved was either on the ground or the second floor and, therefore, as a whole it was a single store when used as one place for the sale of personal property and/or the rendition of services in the ordinary course of business.

Of course, the landlord must concede that the space known as office 8 on the second floor is store space, or else the statute would not be available to obtain that space for him. It follows by parity of reasoning that the cooler space No. 4 on the second floor, a part of the leased premises, is also store space. In fact, it is quite evident in this case that the " store " was the whole integrated space on both floors, and it included the conveyor, which was expressly leased as part of the store.

The statute provides for a ten-year lease to be taken by a store tenant if he wishes to remain and match the new offer. Therefore, if the tenant herein was to take a ten-year lease for part of the premises as presently offered, he would have to do so without knowing whether he could obtain any like extended term in respect to the balance of the store, which in this case is owned by a separate landlord.

In *Morse & Grossman* v. *Acker & Co.* (297 N. Y. 304) the Court of Appeals held that a landlord may not recover part of a single commercial space for his own use in a proceeding under subdivision (d) of section 8 of the Commercial Rent Law (L. 1945, ch. 3, as amd.). In that case the court observed (pp. 310–311): '' The value of commercial space to a tenant lies largely in its particular extent and configuration; the use to which he puts the premises may not admit of gerrymandering or even diminution. Eviction of a tenant from a part of the demised space may well render the remainder so uneconomical and so impractical that he may ultimately have no choice but to surrender the entire area. In other words, partial eviction might well compel complete removal — a result patently at odds with the Legislature's purpose to assure the tenant continued possession. Viewed in this light, it is obvious that the words ' commercial space ', as used in section 8, relate to and denote the entire premises rented and occupied by the tenant. It is those premises which of necessity constitute the minimum unit against which an eviction proceeding may be brought. This interpretation is buttressed by the fact that, while subdivision (a) of the same section 8 — as well as other provisions of the statute (§ 2, subds. [h], [i], [j]) — makes express reference to ' any part of the commercial space ', no similar phrase is used in subdivision (d). This deliberate omission from section 8 (d) of such a qualifying phrase reveals a clear legislative purpose that there shall be no dispossession of a tenant from less than his entire premises, and it is undisputed that the original lessor, as long as he remained the landlord, could not have instituted a proceeding to accomplish the partial eviction of the tenant. Consequently, grantees from that lessor, standing in no better position, acquire no greater right or power to evict or remove the tenant, piecemeal, from a portion of his rented space.''

The same reasoning would seem to apply in this case under subdivision (k) of section 8 of the Business Rent Law. The landlord argues that the case is distinguishable because of the words '' or any part thereof '' found in subdivision (k) of sec-

tion 8 aforesaid. As we have heretofore pointed out, those words do not relate to part of a store, but part of the locale, so that the case cannot be distinguished on this ground.

The Report of the Temporary State Commission to Study Rents submitted to the Legislature on March 23, 1949, recommending the adoption of the matching lease clause (§ 8, subd. [k]) shows that the purpose was to begin partial decontrol, but at the same time give unmodified protection to all other store tenants who require protection. Present occupants of stores were to be given absolute preference. Before a landlord could rent a store to another tenant, he was to be required to offer a lease to the occupying tenant on the same terms and conditions as those proposed to the prospective tenant. Those purposes would not be served if a single store unit could be broken down into parts.

The determination of the Appellate Term and the final order of the Municipal Court should be reversed, with costs, and a final order entered dismissing the petition.

BREITEL, BASTOW, BOTEIN and RABIN, JJ., concur.

Determination of the Appellate Term and the order of the Municipal Court unanimously reversed, with costs to the appellant, and a final order is directed to be entered dismissing the petition herein. Settle order on notice.